# THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JOHNNY HUGHES, | ) |
| Petitioner, | ) |
| vs. | ) Case No. 17 C 2171 |
| RANDY PFISTER, Warden, | ) |
| Respondent. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Following a jury trial in Illinois state court, Johnny Hughes was convicted of murder and attempted armed robbery. The trial court sentenced Hughes to concurrent prison terms of fifty-five years for first-degree murder and ten years for attempted armed robbery. Hughes has petitioned this Court for a writ of habeas corpus under 28 U.S.C. § 2254. For the reasons stated below, the Court denies Hughes's petition in part and orders further briefing on one of his claims.

## Background

Alex Bradley was shot and killed on the morning of June 12, 2001. Bradley's ex-wife, Ruth Bradley, lived in a house separated by an alley from Bradley's home. (The Court uses Ruth Bradley's full name to distinguish her from Alex Bradley, to whom the Court refers as "Bradley.") She testified that Bradley was a "scavenger" who bought and sold items from his backyard. One morning, Ruth Bradley heard a gunshot, so she looked out her window and saw a white car quickly driving away as Bradley stumbled in his yard. She testified that Bradley shouted "Ruth, Ruth, I've been shot." Ex. P at 170

(Ruth Bradley testimony).[1] At trial, a forensic pathologist testified that Bradley had been shot in the torso, near his armpit, and died from his wounds. The government also introduced the testimony of Tawana Smith. She lived nearby and described hearing a gunshot and seeing a white Ford Tempo with a handicapped license plate quickly drive out of the alley. She was able to see and recall all or part of the license plate number.

Relying upon Smith's description of the automobile, police connected Bradley's death first to Arnold Elliott, who was related to the owner of the white Ford Tempo. They also learned Johnny Hughes might be involved in the murder. When they located and pulled over Hughes's car, they found Leon Tanna driving. Tanna was then arrested on an unrelated outstanding warrant. He told the officers that Hughes was being detained in Jasper, Indiana. On June 27, 2001, assistant state's attorney Iris Ferosie and two detectives traveled to Jasper to interview Hughes about Bradley's murder. Hughes did not testify at his trial, and his statements were not recorded, so the description of the conversation that occurred at the jail is based upon the testimony that Ferosie offered at trial.

The detectives spoke with Hughes for approximately twenty minutes before Ferosie entered the interview room. Ferosie testified that, upon joining the detectives, she advised Hughes of his *Miranda* rights and asked if he was willing to speak with her. He agreed. Ferosie testified that Hughes stated that Arnold Elliott had picked him up in a white Ford. Hughes said that he and Elliott snorted heroin and smoked crack cocaine while driving around and, as a result, he did not recall the events of the night well. He recounted possessing a bag of small consumer items—what he described as

---

[1] The Court uses the ECF numbering in its citations, as the individual exhibits contain multiple documents with inconsistent numbering.

merchandise—that they attempted to sell to Bradley.

Ferosie testified that Hughes told her that both he and Elliott left the car and approached Bradley. Hughes carried the merchandise and noticed Elliott was carrying a gun. After they unsuccessfully tried to sell the merchandise to Bradley, Hughes walked back towards the car and left the bag of merchandise atop a trash can. Hughes told Ferosie that he then heard a gunshot. He could not provide more specific details, telling Ferosie: "Listen, I was high, you know, I don't really remember exactly." Ex. R at 34 (Ferosie testimony). After Ferosie pressed him further, Hughes asked her if she had ever smoked crack cocaine. She stated she had not, and he responded: "You know what? That's my story. I'm done talking." *Id.* at 35.

Ferosie and the detectives left the interview room and returned to a waiting room. Soon after this, a Jasper police officer told them Hughes wanted to speak to them again. Ferosie testified that, when she returned to the room in which Hughes was held, he told her, "I'm going to tell you the truth now." *Id.* at 36.

According to Ferosie's testimony, she re-advised him of his *Miranda* rights. Hughes told her he understood the rights, and he then provided a different account of Bradley's murder from the one he had given earlier. Hughes affirmed that he and Elliott initially spent the night using drugs. Yet Hughes also told Ferosie that, upon entering Elliott's car, Elliott gave him a gun and told him they were going to "do a lick," meaning they would rob someone. *Id.* at 37. Hughes told Ferosie that he and Elliott drove around all night but were unable to find anyone to rob, so they decided to drive to Bradley's residence to sell the merchandise for more gas money. During this account, Hughes told Ferosie that he, not Elliott, was holding the gun when they approached

3

Bradley. Bradley did not want to buy the items they had to offer, which made Hughes angry. He told Ferosie that he pulled out the gun, pointed it at Bradley, and began to search Bradley's pockets for money. While his hand was in Bradley's front shirt pocket, Bradley pushed him away, which according to Hughes caused the gun to fire. Ferosie testified that Hughes told her that he and Elliott then fled without ever obtaining any money. Hughes said that, after the murder, he told Leon Tanna—who called Hughes his uncle, though they were not related—about the murder.

Three years after his conviction for murder—as part of a state post-conviction petition—Hughes filed an affidavit stating that he never waived his rights and refused to answer Ferosie's questions but that nonetheless he was "continuously interrogated." Ex. S at 19 (Hughes affidavit).

At the end of the conversation, Ferosie provided Hughes with several options to memorialize his statement. She testified that Hughes said he did not trust video recording or a court reporter and did not want to write his own statement. Also, Hughes was unwilling to provide any further statement unless Ferosie could promise him a deal. Ferosie stated she was unable to offer a deal on her own, so Hughes refused to speak with her any further. Ferosie then returned to Chicago.

On July 3, Ferosie met with Tanna, who was detained at the Cook County Jail after being arrested while driving Hughes's car. Ferosie testified that Tanna told her about a conversation in which Hughes described shooting Bradley. Tanna told Ferosie that Hughes said he had shot Bradley as the result of a "reflex," Ex. R at 49-50 (Ferosie testimony), and did not know whether he had killed Bradley. Ferosie also testified that there were no noticeable signs of injury on Tanna and that Tanna said he was treated

4

"fine" by the police. *Id.* at 50. After their discussion, Ferosie documented Tanna's statement, which she then read to him aloud as he signed the bottom of each page to indicate his acceptance of the statement. Tanna later testified to similar effect before a grand jury.

At trial, however, Tanna testified that he had been coerced by the police into making a statement to Ferosie while in custody and again before the grand jury. During his trial testimony, Tanna said he did not recall any conversation in which Hughes told him he shot Bradley.

At Hughes's trial, Elliott—the driver on the night Bradley was killed—also testified. Elliott testified that he and Hughes consumed drugs and eventually decided to sell Hughes's bag of merchandise to Bradley. Elliott said he remained in the car while Hughes walked with the merchandise to Bradley's backyard. Elliott claimed Hughes left his line of sight, and he then heard a gunshot and saw Hughes return to the car. They left, and Hughes later told him that Bradley had tried to grab him and the gun went off. Elliott claimed he did not know Hughes possessed a gun until he returned to the car.

At trial, the government introduced the testimony of a forensic investigator who stated that Hughes's fingerprint was on the bag of merchandise, which was found in Bradley's backyard.

Following a jury trial, Hughes was convicted of first-degree murder and attempted armed robbery. He was sentenced to concurrent prison terms of fifty-five years for murder and ten years for armed robbery.

The Illinois Appellate Court affirmed Hughes's conviction but remanded his case for resentencing based upon an error in his attempted armed robbery conviction.

*People v. Hughes*, No. 1-03-1898, slip op. at 28-29 (Ill. App. Feb. 2, 2005). He filed a petition for leave to appeal (PLA) to the Illinois Supreme Court, Ex. E at 30 (PLA on direct appeal), which was rejected. *Id.* at 50 (Order denying PLA).

On May 17, 2006, Hughes filed a petition for post-conviction relief. Ex. S (Hughes Post-Conviction Pet.). Together with the petition, Hughes filed an affidavit in which, as noted earlier, he stated that he had not waived his rights under *Miranda* during the interrogation at the Indiana jail but rather had refused to answer questions. He further stated that Ferosie nonetheless persisted in questioning him. Ex. S at 19. Hughes contended in the post-conviction petition that, among other things, his trial counsel had been ineffective in failing to move to suppress his confession. The trial court dismissed Hughes's petition, and he appealed. The state appellate court held that any error the trial attorney made in failing to move to suppress the confession was not prejudicial, as the confession did not "tip the scales against the defendant" in the jury's determination of guilt given the other evidence implicating Hughes, the absence of testimony "exonerating [Hughes] as the shooter," and "the lack of any contrary evidence" on that point. *People v. Hughes*, 2016 IL App (1st) 131188-U, ¶ 119. Hughes filed a PLA, Ex. O at 55 (PLA on post-conviction appeal), which the Illinois Supreme Court denied. Ex. O at 158 (Order denying PLA).

## Discussion

Before a federal court may grant a motion for habeas under 28 U.S.C. § 2254, a state prisoner must show that his incarceration violates the laws, treaties, or the Constitution of the United States, 28 U.S.C. § 2254(a)

Hughes asserts eight claims in his petition. He contends: (1) the trial court

wrongly admitted hearsay testimony as substantive evidence; (2) the prosecution engaged in misconduct; (3) the firearm enhancement applied to his sentence lacks a reasonable relationship to the public interest; (4) the firearm enhancement, which imposes a higher sentence if the firearm is used to cause the death or serious injury of another, doubly punishes the offense of murder; (5) the firearm enhancement is disproportionately severe; (6) the firearm enhancement should only be applied if a party other than the victim of the predicate offense (e.g., Bradley) was injured; and (7) the armed robbery conviction should be vacated under the one act-one crime principle recognized by Illinois law. Finally, Hughes claims that (8) he was prejudiced by ineffective assistance of counsel, as his trial attorney failed to move to suppress his confession. Respondent argues that the first seven claims are barred for various reasons and that the Court should reject the eighth on the merits.

**I.       Claim 1**

Hughes argues the trial court should not have admitted assistant state's attorney Ferosie's hearsay testimony about the inculpatory statements Tanna made at Cook County Jail. Habeas Pet. at 17. As respondent notes, the appellate court held in Hughes's direct appeal that he waived this issue "by failing to object to the testimony at trial and failing to raise this issue in his post-trial motion." *People v. Hughes*, No. 1-03-1898, slip op. at 10 (Ill. App. Feb. 2, 2005) (citing *People v. Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124 (1988)). A finding of waiver constitutes an independent and adequate state-law ground that bars federal review of the claim. *Perruquet v. Briley*, 390 F.3d 505, 514 (7th Cir. 2004).

"Ineffective assistance of counsel . . . is cause" that may excuse a procedural

7

default like the one Hughes made by failing to assert the claim in state court in the proper way, but "a claim of ineffective assistance [must] be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." *Murray v. Carrier*, 477 U.S. 478, 489 (1986). *See also Wrinkles v. Buss*, 537 F.3d 804, 812 (7th Cir. 2008). In his post-conviction petition, Hughes asserted that his attorney rendered ineffective assistance by failing to object to Ferosie's hearsay testimony. Ex. S at 2 (Post-conviction petition). So far, so good. Yet in his post-conviction PLA, Hughes abandoned all of his arguments except for an ineffective assistance of counsel argument that had nothing to do with Ferosie's hearsay testimony. Ex. O at 69 (Post-conviction PLA). Thus Hughes did not fully exhaust his ineffective assistance claim in state court, and as a result he cannot use ineffective assistance to excuse his default on his claim regarding the admission of Ferosie's testimony. The Court therefore overrules Claim 1.

## II. Claim 2

Hughes argues that the prosecution engaged in misconduct by (1) eliciting testimony about Bradley's family to stir up the passions of the jury and (2) misstating the reasonable doubt standard during the closing argument. Habeas Pet. at 32. Respondent argues Hughes has procedurally defaulted this argument, as he raised the issue on direct appeal but failed to raise it in his direct appeal PLA. Ex. E at 30 (PLA on direct appeal). "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Hughes has offered no basis to excuse this default. The Court overrules Claim

2 as well.

## III. Claim 3

Hughes contends that applying the firearm enhancement to his sentence violates due process because the Illinois legislature lacked a rational basis to enact such a severe penalty for use of a firearm. Habeas Pet. at 38. The Court considers the merits of this argument, as Hughes's petition cites his federal due process rights and he presented this argument to state courts, albeit in summary fashion. See Ex. B at 30 (Direct appeal opening brief); Ex. E at 47 (PLA on direct appeal).

A criminal statute passes muster if the reviewing court can identify a rational basis for the legislature's decision to pass it and the statute is neither cruel nor unusual. *Chapman v. United States*, 500 U.S. 453, 465-66 (1991). Hughes argues that the firearm enhancement, 725 ILCS 5/5-8-1(d)(iii), violates due process. At the time of Hughes's conviction, the first-degree murder statute imposed a term of "not less than 20 years and not more than 60 years." *Id.* § 5/5-8-1(a)(1)(a) (2003). But the firearm enhancement calls for addition of twenty-five years imprisonment or up to a term of natural life (life without parole). *Id.* § 5/5-8-1(d)(iii) (2003).

Can there be a rational basis for a legislature to enact a sentence enhancement with penalties more severe than the predicate offense? Both Illinois and federal courts answer "yes." In *People v. Sharpe*, 216 Ill. 2d 481, 839 N.E.2d 492 (2005), the Illinois Supreme Court described in detail the "serious threat to the public health, safety, and welfare caused by the use of firearms in felony offenses" that motivated the Illinois legislature to enact the enhancement. *Id.* at 522-23, 839 N.E.2d at 531-32. The Illinois Supreme Court noted that, although a murder entails the death of one individual, the

use of a firearm endangers any bystanders within "the firearm's effective deadly range." *Id.* Other judges in this district have concurred, concluding that this particular enhancement does not violate the Due Process Clause. *See Alcozer v. Pfister*, No. 11 C 7612, 2014 WL 4947672, at *5 (N.D. Ill. Oct. 1, 2014); *McIntosh v. McCann*, No. 09 C 0518, 2009 WL 2244618, at *5 (N.D. Ill. July 27, 2009). This Court agrees; the Illinois legislature had a rational basis to enact the firearm enhancement. The Court therefore denies Claim 3 on the merits.

## IV. Claims 4 through 7

Claims 4 through 7 all raise state law issues. Habeas Pet. at 43-63. A prisoner in state custody may only obtain a writ of habeas corpus "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). In other words, habeas corpus relief is not available on a claim that the petitioner's custody violates *state* law.

Claim 4 is not cognizable on federal habeas corpus review. Hughes contends the firearm enhancement violates the prohibition on "double enhancement," which is a creature of Illinois law. *See Thompson v. Harrington*, No. 09 C 7913, 2013 WL 5663460, at *6 (N.D. Ill. Oct. 17, 2013). Claim 5 similarly fails, as Hughes alleges the enhancement violates the Illinois Constitution's proportionate penalties clause, Ill. Const., art. I, § 11. *See Keller v. McCann*, 553 F. Supp. 2d 1002, 1012 (N.D. Ill. 2008). Claim 6, in which Hughes contends the state court misinterpreted the text of the firearm enhancement statute, involves a question of the proper construction of a state statute. A question of state statutory construction does not raise any issue of federal law. *See Thompson*, 2013 WL 5663460, at *4. Similarly, Claim 7 rests on the one act-one crime

10

principle, which is a rule of construction created by Illinois courts. *See Young v. Varga*, No. 16 C 3386, 2017 WL 386655, at *4 (N.D. Ill. Jan. 27, 2017); *King v. Cahill-Masching*, 169 F. Supp. 2d 849, 854-55 (N.D. Ill. 2001). The Court overrules each of these state-law claims.

## V.     Claim 8

Finally, Hughes argues that his attorney rendered ineffective assistance of counsel. Hughes contends that the attorney should have moved to suppress his confession. Specifically, he contends that he invoked his right to remain silent during questioning at the Indiana jail, but Ferosie continued to question him. A defendant may establish a violation of the Fifth Amendment if a prosecutor "failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind." *Michigan v. Mosley*, 423 U.S. 96, 105-06 (1975). Though Hughes phrases his ineffective assistance claim as involving his attorney's failure to a violation of *Miranda*, he is really contending that his attorney was ineffective for failing to argue that his statement should be suppressed due to a *Mosley* violation. To prevail on a claim of ineffective assistance of counsel, a habeas corpus petitioner must demonstrate (1) objectively deficient counsel and (2) actual prejudice. *Strickland v. Washington*, 466 U.S. 668, 687-96 (1984).

Hughes raised this issue for the first time in his post-conviction petition. He supported the claim with an affidavit in which he stated that he was "continuously interrogated" after he invoked his right to remain silent. Ex. S at 19 (Hughes affidavit). Notably, Hughes did not state in the affidavit that he had ever informed his trial attorney

of the purported *Mosley* violation. *Id.*

The Illinois Appellate Court ruled that Hughes could not prevail on his ineffective assistance claim, but it ruled on the basis of the absence of prejudice without addressing the claim of deficient performance by counsel. The court correctly identified the standard for prejudice: it said that Hughes "must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different" and that "a reasonable probability is a probability sufficient to undermine confidence in the outcome . . . ." *Hughes*, 2016 IL App (1st) 131188-U, ¶ 117 (citing *Strickland*, 466 U.S. at 694). The court noted that the prosecution contended that the evidence at trial was "overwhelming," but the court did not make such a finding itself. *Id.* ¶ 118. The court stated that "[t]here was no dispute at trial that the shooter was one of . . . two men," Hughes or Elliott. *Id.* ¶ 119. Although Tanna had recanted his prior statements, the court said, "the jury had in front of it both Tanna's prior statements [inculpating Hughes] and Elliott's testimony identifying [Hughes] as the shooter," and "there was no testimony at trial exonerating [Hughes] as the shooter." *Id.* The court said that given Tanna's prior statements, Elliott's identification of Hughes as the shooter, "and the lack of any contradictory evidence on this point, we cannot say that [Ferosie's] testimony about a confession tipped the scales against [Hughes] and persuaded the jury to conclude that [Hughes] was the shooter rather than Elliott." *Id.*

In his habeas corpus petition, Hughes contends that the Illinois Appellate Court unreasonably applied *Strickland* in concluding that he did not experience prejudice from his attorney's purported error. Under *Strickland*, Hughes could establish prejudice by showing it was reasonably probable that exclusion of Ferosie's testimony about his

12

confession, via a successful motion to suppress under *Mosley*, would have led to a different outcome at trial. *Strickland*, 466 U.S. at 694. "Surmounting Strickland's high bar is never an easy task," but "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both 'highly deferential' and when the two apply in tandem, review is 'doubly' so." *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

One potential problem in the state appellate court's analysis of the prejudice issue lies in its determination that admission of Hughes's confession did not "tip the scales" in the jury's determination of guilt. Whether a particular item of evidence "tipped the scales" is not the question that *Strickland* requires a court to decide. Rather, the issue is whether there is a "probability" of a different result that is "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The Court acknowledges, as respondent argues, that the Seventh Circuit has held that "a single reference to 'tipping the scales' does not demonstrate" that the state court applied a standard contrary to *Strickland*, *Allen v. Chandler*, 555 F.3d 596, 601 (7th Cir. 2009). But here the question is not whether the state court's decision ran afoul of the "contrary to" standard under 28 U.S.C. § 2254(d)(1)—the issue the court was addressing in *Allen* when it said this—but whether the state appellate court made an "unreasonable application" of the *Strickland* standard.[2] In that regard, the court's use of this vague, untethered standard does not provide much comfort that it was applying *Strickland* reasonably.

There are other problems as well. A defendant's confession is "probably the

---

[2] The Court also notes that *Allen* did not involve the allegedly inappropriate admission of a defendant's confession, perhaps the most inculpatory type of evidence there is.

13

most probative and damaging evidence that can be admitted against him." *Parker v. Randolph*, 442 U.S. 62, 72 (1987) (plurality opinion) (citation omitted); *see also, e.g., People v. Halmon*, 225 Ill. App. 3d 259, 278, 587 N.E.2d 1182, 1194 (1992) (a voluntary confession "constitutes the highest and most damaging type of evidence known to law.") (citing *People v. Byrd*, 21 Ill. 2d 114, 116, 171 N.E.2d 782, 783 (1961)). But it is questionable whether the state appellate court looked at the confession that way in applying *Strickland*. The court's reliance on the absence of "testimony . . . exonerating [Hughes] as the shooter" is also arguably problematic, as it seemingly shifts the burden of proof to Hughes, the defendant. And more generally, the evidence aside from Hughes's confession that implicated him was not terribly more compelling than the evidence that inculpated Elliott. There was evidence that both were in the car, and as the appellate court noted, it was relatively clear from the evidence that one of them was the shooter. Elliott pointed the finger at Hughes, but the reliability of that testimony is tempered to some extent given his obvious interest in deflecting any implication of his own guilt. And Tanna's grand jury testimony against Hughes, the only other evidence pointing toward Hughes and away from Elliott, was rendered less compelling by Tanna's recantation of that testimony at trial. All of this suggests a reasonable possibility of a different outcome had Hughes's confession been excluded.

All of that said, the Court may need not to make, at this point, a final determination regarding whether the state appellate court unreasonably applied *Strickland* in assessing the prejudice from trial counsel's failure to move to suppress Hughes's statements under *Mosley*. There is potentially a more basic, threshold problem with Hughes's ineffective assistance claim. Specifically, the state court

14

record—in particular, the record of Hughes's post-conviction petition—does not appear to contain any evidence that Hughes ever made his trial counsel aware of his claimed invocation of his right to remain silent and Ferosie's continued interrogation of him despite that invocation. Without such evidence, there would not appear to have been any basis in the record for the state court to determine that counsel's performance fell below *Strickland's* objective reasonableness standard: if counsel were never made aware of the *Mosley* violation, how could they have acted ineffectively in failing to file a motion to suppress? The state appellate court noted this as a potential issue but declined to address it given its determination of the prejudice issue. *See Hughes*, 2016 IL App (1st) 131188-U, ¶¶ 109-10.

The Court is inclined to say that any potential unreasonable application of the *Strickland* prejudice standard by the state appellate court is harmless given the absence of support for Hughes's contention that his trial counsels' performance was objectively deficient, for the reason just described. Because the parties have not addressed this point, however, the Court will give them an opportunity to do so before making a final determination. The Court thus defers ruling on Hughes's eighth claim pending further briefing.

## Conclusion

For the foregoing reasons, the Court overrules Hughes's claims 1 through 7. Having overruled these claims on procedural grounds, the Court concludes that a certificate of appealability (COA) under 28 U.S.C. § 2253(c)(1) should not issue regarding the denial of the claims, as reasonable jurists would not find it debatable that the Court was incorrect in its procedural rulings. *Slack v. McDaniel*, 529 U.S. 473, 484

(2000). As to Claim 8, Hughes's ineffective assistance claim, the Court directs Hughes to file a further memorandum in support of the claim by no later than September 27, 2019 and directs respondent to file a response to Hughes's memorandum by no later than October 25, 2019.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: August 15, 2019